

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MKM:MRG
F. #2018R02189

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 29, 2022

By E-mail and ECF

The Honorable Margo K. Brodie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

                Re:    United States v. Anthony Pandrella
                          Criminal Docket No. 19-122 (MKB)

Dear Chief Judge Brodie:

        The government respectfully submits this letter memorandum in advance of the sentencing of defendant Anthony Pandrella on October 5, 2022. Following a two-week trial, a jury convicted the defendant of murdering his close friend, Vincent Zito, by shooting him execution-style in the back of the head from close range in Zito's own home. To this day, the defendant refuses to take responsibility for his actions, let alone express remorse for the victim or his family. For these reasons, and the additional aggravating factors set forth below, the Court should sentence the defendant to the advisory Guidelines range of life imprisonment.

I.      Background

        On June 13, 2022, the defendant was convicted, following trial, of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) ("Count One"), unlawful use, brandishing and discharge of a firearm, in violation of 18 U.S.C. § 924(c) ("Count Two"), and causing death through use of a firearm, in violation of 18 U.S.C. § 924(j) ("Count Three"). At trial, the government called 28 witnesses and introduced evidence including but not limited to DNA evidence, surveillance video evidence, crime scene photographs, cell-site evidence, ballistics evidence, telephone toll records, text messages, financial records, and expert testimony relating to the autopsy of murder victim Vincent Zito. The facts set forth below are taken from testimony and evidence introduced at trial and are consistent with the facts set forth in the United States Probation Department's ("Probation") Presentence Investigation Report, dated August 25, 2022,

the First Addendum, dated September 8, 2022 and the Second Addendum, dated September 12, 2022 (collectively, the "PSR").

A.  The Offense Conduct

As proven at trial, on October 26, 2018, the defendant entered the house of Vincent Zito, his close friend of many years. While inside, the defendant shot Zito in the back of the head at close range to avoid returning a sum of money he was holding for Zito and, in addition, robbed Zito of luxury watches, the assets of Zito's loansharking business. Zito was 77 years-old and ill at the time of his death. Zito's body was discovered by his 11-year-old grandson.

Following the murder, the defendant then began a cover-up, systematically getting rid of evidence that might tie him to the crime. He even came back to the murder scene that same night to sit with the Zito family's friends and relatives, feigning sympathy, to learn what he could about the investigation before returning home to, again, remove potential evidence of his crimes from his car.

1.  Events Prior to the defendant's Robbery-Murder of Vincent Zito

In 1972, Vincent Zito was convicted of conspiracy to collect extensions of credit through extortionate means. Zito ceased operating as a loan shark for some time before reengaging in that business. In the years prior to his death, Vincent Zito was a loan shark and had a loansharking business, although he planned to wind down his business operations. Vincent Zito generally had a lot of cash on hand at his home and, by the summer of 2018, he also had luxury watches that had been posted as collateral by a loan customer.[1] In order to keep his business and his family safe, Zito kept a gun close by and he had his friend and neighbor, who testified at trial, install a video surveillance system.

By 2018, at the age of 77, Vincent Zito's health was failing, and he was slowing down. In the summer of 2018, he was in the hospital on multiple occasions. He had only a few loan customers left, several of whom testified at trial. And—using profits from his loansharking business—he even let some of his close friends borrow money without paying interest. Vincent Zito spoke to trial witnesses about getting out of the business, selling his house, and moving away from Brooklyn. He also spoke to trial witnesses about moving to New Mexico to be near his two daughters.

---

[1] Vincent Zito's loansharking business operated in cash and affected interstate commerce. In addition, money from Zito's loansharking business was used to support businesses that purchased supplies interstate, needed to make payroll, and otherwise used Zito's loans to help those interstate businesses operate.

During this time, Vincent Zito maintained a close relationship with the defendant. Vincent Zito relied on the defendant, including by asking him, at times, to hold cash from the loansharking business. In addition, Zito indicated that, if he moved out of town to live with his daughters, Pandrella would collect the outstanding debts of the loansharking business.

About a year before the murder, the defendant told Vincent Zito that Zito was "hot," meaning under scrutiny by law enforcement. As a result, Vincent Zito gave the defendant a large sum of money, approximately $750,000, to hold for safekeeping. However, when Vincent Zito asked for the money back, the defendant either could not or would not give it back. Vincent Zito told several individuals that the defendant had taken approximately $750,000. Zito was angry about the missing money and demanded it back.

2. The Night of the Robbery-Murder

On October 26, 2018, the defendant went to Vincent Zito's home at 8:10 a.m. Zito was expecting the defendant to return at least a portion of the $750,000 that the defendant owed him. While inside, the defendant shot Zito at close range in the back of the head and stole the expensive watches that had been posted as collateral for a $50,000 loan from Zito. There were no defensive wounds or any other evidence of a struggle. The defendant left Zito's house with the watches at 10:22 a.m. For the remainder of the day, the defendant sought to cover-up the crimes and eliminate evidence that might link him to the crimes, including from his clothing and the floormat of his car. The defendant came back to the murder scene that night to sit with the Zito family's friends and relatives to learn what he could about the investigation before returning home to, again, remove potential evidence of his crimes from his car.

3. The Defendant's Post-Murder Conduct and Obstruction

As established at trial (e.g., Tr. 172-73, 1085-86), in an effort to cover up his crimes, the defendant repeatedly lied when interviewed by law enforcement prior to his arrest. Specifically, on November 10, 2018, prior to the defendant's arrest, the defendant was interviewed by the Federal Bureau of Investigation ("FBI"). During that interview, the defendant told the FBI that he (the defendant) went to Nora's Bar from 11:30 a.m. to 12:00 p.m. and returned to Nora's a second time later that afternoon. The defendant further stated that he received a telephone call from John Maffeo at approximately 3:30 p.m. and that Maffeo told the defendant that Vinny Zito was shot in the head. However, Maffeo testified, consistent with phone records admitted at trial, that Maffeo called the defendant and said: "Vinny's dead, did you hear anything, and he's like, no. And then he said, I'll call you back, and I never heard anything." Maffeo testified that he did not tell the defendant how Vincent Zito had died because, at the time of Maffeo's call with the defendant, Maffeo did not know how Vincent Zito had died.

On November 12, 2018, the defendant stated to the FBI that he went to Nora's bar between approximately 11:30 a.m. and 12:00 p.m. for lunch and then went home and sometime later in the afternoon returned to Nora's bar. In fact, the defendant only went to

3

Nora's once on the day of the murder. As demonstrated by cell-site evidence and expert testimony at trial, between 11 a.m. and 1:00 p.m.—the time the defendant stated he was at Nora's—the defendant was in fact driving along the Belt Parkway to a property owned by his associate, George Lombardozzi. (Tr. 949-953.)

B. Relevant Uncharged Criminal Conduct

The information set forth below is accurately reflected in the PSR.

1. The Defendant's Association with the Gambino Crime Family

The defendant is a long-time associate of the Gambino crime family. As early as 2002, the defendant, attended meetings of the crew of Gambino captain Daniel Marino[2] and Gambino soldier George Lombardozzi[3] at and around restaurants in Manhattan, New York. At those meetings, Gambino crime family members and associates came to pay tribute to Marino and Lombardozzi.

More recently, leading up to the time of the robbery and murder in 2018, the defendant remained in close contact with Lombardozzi. Among other things, telephone records show that the defendant spoke to Lombardozzi just over an hour after the robbery and murder of Vincent Zito on October 26, 2018. As described below, cell-site records admitted at trial demonstrate that the defendant drove to a property owned by Lombardozzi shortly after the robbery-murder. Following his crimes, the defendant remained in close contact with Lombardozzi, with approximately 73 calls between the two from November 12, 2018 to February 19, 2019 alone, and additional calls leading up to the day of the defendant's arrest.

In addition, up until approximately 2016, the defendant was known to associate with Eugene "Buster" Russo, a Gambino crime family soldier who ran a gambling club on Voorhies Avenue in Brooklyn, New York. Indeed, the defendant was interviewed by the FBI on November 11, 2018, prior to his arrest, and acknowledged that he knew "Eugene," also known as "Buster," who used to have a gambling club on Voorhies Avenue in Brooklyn. The defendant indicated that he used to go to the club to visit Buster, but would not gamble there.

2. The Defendant's Involvement in Loansharking and Debt Collection

The defendant also engaged in loansharking himself. For example, John Doe, who was prepared to testify at trial, met the defendant when John Doe was working at

---

[2] In 2011, Daniel Marino was convicted of conspiracy to murder a witness in United States v. Marino, 09-CR-1243 (S.D.N.Y.).

[3] In 2003, George Lombardozzi was convicted following a jury trial of extortionate extension and collection of credit. United States v. Lombardozzi, 02-CR-273 (S.D.N.Y.).

4

Russo's illegal gambling club. According to Doe, the defendant would play cards approximately four-days per week and assist the club owner by getting games started. At one point, the defendant informed John Doe that he had received a financial settlement in connection with an injury and offered to loan John Doe money. John Doe borrowed money from the defendant and paid "three points," meaning that he was required to pay three percent interest each week, which did not reduce the principal. At first, John Doe borrowed $1,000 from the defendant, which he eventually repaid after paying three points for multiple weeks. John Doe later borrowed $2,000 from the defendant, which John Doe used to gamble, and again was required by the defendant to pay three points per week. John Doe was able to repay this loan after paying three points for multiple weeks. Finally, John Doe borrowed $5,000 from the defendant. John Doe lost the money gambling and was unable to repay the debt. Thereafter, for a significant period of time, John Doe paid the defendant three points, or $150 per week, without reducing the principal. Eventually, John Doe was unable to come up with the interest payments and stopped paying the defendant. PSR ¶ 9.

After several months without paying, the defendant told John Doe that the debt had increased to $10,000. In an attempt to earn money to be able to pay the defendant, John Doe began operating an illegal gambling business with the defendant. John Doe had a "sports sheet" with the defendant, meaning that gamblers would place bets on which the defendant served as the "bank," i.e., the defendant took in money when the gamblers lost and paid out when the gamblers won. John Doe assisted the defendant by recruiting gamblers and physically collecting money from losing bettors, which he provided to the defendant, and delivering money, provided by the defendant, to winners. John Doe would keep approximately 25% of the profit from the gambling operation and give the rest to the defendant. PSR ¶ 10.

Despite John Doe's efforts to repay the debt through the profits from the gambling operation, the defendant continued to try to collect from John Doe. At one point in 2016, the two met at a bar on Nostrand Avenue in Brooklyn and the defendant threatened John Doe with a gun while demanding repayment. John Doe later went to the police station to report the incident. To John Doe's dismay, one of the detectives called the defendant and informed him of what John Doe had reported. In speaking to a detective, the defendant laughed when asked about loansharking and John Doe. The defendant then acknowledged the loan and indicated that he did not think he would see "the $10,000" again. The defendant indicated that he knew John Doe was "getting in too deep" and did not want to see him get hurt. He further acknowledged that John Doe had been paying him $300 per week, but that the payments had waned off. Finally, the defendant admitted that there had been an argument and that he had called John Doe a "deadbeat." PSR ¶ 11.

The PSR further includes information from two witnesses, in addition to Doe, about the defendant using threats to collect gambling debts and, consistent with information provided by Doe, the defendant's additional attempts to run his own loansharking business. PSR ¶ 12.

5

II.   Guidelines Range and PSR Objections

The defendant faces a statutory mandatory minimum sentence of 10 years and a maximum sentence of life on Count Two, discharging a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).  He also has a maximum sentence of life for Count One, Hobbs Act robbery, and Count Three, causing death through use of a firearm.

The Probation Department has calculated that the defendant has a Base Offense Level of 43 as to Counts One and Three, and a Criminal History Category of one.  PSR ¶ 68.  This carries a guideline imprisonment range of life.  Id.  The government agrees with these calculations, as does the defendant.

The defendant objects to paragraphs 9-13 of the PSR, but has provided no factual basis to support such objections.[4]  Accordingly, there is no need for an amendment on these points.  In any event, while the defendant's uncharged criminal conduct is clearly an aggravating factor and may warrant an upward departure (PSR ¶ 81), the defendant already has the maximum base offense level—43—and a Guidelines sentence of life imprisonment is appropriate even without the Court making findings as to the defendant's uncharged criminal conduct.

The defendant also argues that an enhancement for obstruction does not apply because his false statements to the FBI were not "material."  According to United States Sentencing Guidelines ("U.S.S.G.") § 3C1.1, cmt. n. 4(G), an adjustment for obstruction applies if the defendant "provid[ed] a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense."  Owing, in part, to his false statements, the defendant remained at liberty for five months during the FBI's investigation.  The defendant's false statements to law enforcement, see infra at Section I.3, satisfy the materiality standard and therefore warrant application of the obstruction enhancement.  See e.g., United States v. Feliz, 286 F.3d 118, 121 (2d Cir. 2002) (engaging in scheme to provide false alibi to law enforcement supported application of obstruction enhancement).   As with the defendant's uncharged conduct described above, while the defendant's obstruction is clearly an aggravating factor and may warrant an adjustment or enhancement (see Addendum 2), the defendant has the maximum base offense level—43—and a Guidelines sentence of life imprisonment is appropriate even without the Court making findings as to the obstructive conduct in which the defendant engaged.

III.   Restitution

The government notes that, while Probation has listed in Addenda One and Two financial losses suffered by the victim's family members, it has not taken a position as to the correct restitution amount.  The government is further assessing the legal and factual bases for restitution and will supplement this submission accordingly.  The government

---

[4]   The defendant did not object to the PSR within 14 days of receipt, as required by Federal Rule of Criminal Procedure Rule 32(f)(1).

6

respectfully requests that any restitution order be entered within 90 days after sentencing as is permitted by law. PSR ¶ 78.

IV. Discussion: Life Imprisonment is Warranted in this Case

It is settled law that a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Gall v. United States, 552 U.S. 38, 49-50 (2007) (citation and footnote omitted). Title 18, United States Code, Section 3553(a) provides, in part, that in imposing sentence, the Court shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant.

The nature and circumstances of the instant offenses, see 18 U.S.C. § 3553(a)(1), are extremely serious. The defendant participated in the cold-blooded, execution-style murder of Vincent Zito. The defendant murdered his close friend for greed—specifically, in order to avoid returning a sum of money he was holding for the victim and to steal from his loansharking business. The victim's body was discovered by his 11-year-old grandson. In a particularly cruel twist, the defendant then pretended to console the victim's family on the night of the murder while gathering information about the investigation.

Based on the premeditated and heinous nature of the murder, the Guidelines call for life imprisonment. If ever there were a case where a Guidelines sentence is appropriate, this is it. The defendant does not even attempt to dispute that. There are no mitigating circumstances about the defendant's background or conduct that would support a downward departure. To the contrary, there are a number of aggravating circumstances present that make this case worse than even most premediated murders that result in a Guidelines sentence of life imprisonment.

First, the murder of the defendant's frail, elderly friend was callous, cold-blooded and motivated by greed. The defendant knew the victim's family, which had welcomed him into their home; he knew the anguish this murder would cause—and he did it anyway, for money.

Second, unlike many defendants charged with similar crimes, the defendant did not face adversity in his youth, or even in his adulthood. The defendant had an average,

middle-class life with no extraordinary hardship. The defendant simply believed he could get away with murder, and he tried to just that. He then attempted a cover up and he lied, including to the FBI and now to the Court.

Third, the only suggestion the defendant makes as to a mitigating circumstance is that his health is in poor condition given his age. By that logic, the defendant argues that he should be punished less severely than more youthful offenders. In fact, the defendant's age, relative maturity, and life position make clear that the murder of his friend was cold and calculated. Moreover, the defendant's health is similar now to when he committed this brutal murder, and no health limitations prevented him from doing that. The defendant's age and life experience should be considered an aggravating factor, not the other way around.

Fourth, there is no indication that the defendant has accepted responsibility for his actions, or that he has any genuine remorse for the murder he committed. He is capable of doing it again. This makes clear that incapacitation is warranted.

Fifth, general deterrence calls for a life sentence for this premeditated murder of one of the defendant's closest friends for money—without any mitigating circumstances. The message must be clear that resorting to murder is unacceptable for anyone, let alone someone in the defendant's position.

Sixth, the severe penalty called for by the Guidelines is required to bring a measure of justice to the defendant's victims, who have explained their grief in detail through victim impact statements which are included in the PSR, and to the community.

V.    Conclusion

For the foregoing reasons, the Court should sentence the defendant to life imprisonment.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/
M. Kristin Mace
Matthew R. Galeotti
Assistant U.S. Attorneys
(718) 254-7000

cc:    Clerk of Court (MKB) (by ECF)
       Defense counsel (by ECF)